JS-CAND 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

California Indian Legal Services (CILS)

**(b)** County of Residence of First Listed Plaintiff: Sacramento
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Dorothy Alther, CILS, 609 S. Escondido, Escondido, CA 92025. (760) 746-9841
See Attachment

## DEFENDANTS

United Stated National Archives and Records Administration and Bradford Wilson, in his official capacity

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment Of Veteran's Benefits
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury -Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury – Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities–Employment
- ☐ 446 Amer. w/Disabilities–Other
- ☐ 448 Education

**PRISONER PETITIONS**

**HABEAS CORPUS**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**OTHER**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee– Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC § 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC § 158
- ☐ 423 Withdrawal 28 USC § 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent—Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS–Third Party 26 USC § 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC § 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation–Transfer
- ☐ 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity)**:
5 U.S.C. § 701 et seq.

Brief description of cause:
Violation of the Administrative Procedures Act; Review of Final Agency Action

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE Honorable Noël Wise DOCKET NUMBER Case 3:26-cv-11868

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

**(Place an "X" in One Box Only)** ☒ **SAN FRANCISCO/OAKLAND** ☐ **SAN JOSE** ☐ **EUREKA-MCKINLEYVILLE**

**DATE** 10/21/2026 **SIGNATURE OF ATTORNEY OF RECORD** Dorothy Alther

Print Save As... Reset

Case 3:26-cv-12310 Document 1 Filed 10/22/26 Page 2 of 68 PageID 2

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| CALIFORNIA INDIAN LEGAL SERVICES<br>Plaintiff,<br>vs.<br><br>NATIONAL ARCHIVES AND RECORDS ADMINISTRATION and NATIONAL ARCHIVIST BRADFORD WILSON, IN HIS OFFICIAL CAPACITY<br><br>Defendants. | ) | **Attachment**<br>**Attorneys of Record** |

**Dorothy Alther SB# 140906**
**CALIFORNIA INDIAN LEGAL SERVICES**
**609 S. Escondido Boulevard**
**Escondido, CA 92025**
**Telephone: 760-746-8941**
**dalther@calindain.org**

**Jay B.Petersen SB# 111130**
**CALIFORNIA INDIAN LEGAL SERVICES**
**106 K Street, Suite 300**
**Sacramento, CA 95814**
**Telephone: 916 -978-0906**
**jpetersen@calindian.org**

**Attorneys for Plaintiff**
**California Indian Legal Services**

Dorothy Alther SB# 140906
CALIFORNIA INDIAN LEGAL SERVICES
609 S. Escondido Boulevard
Escondido, CA 92025
Telephone: 760-746-8941
dalther@calindain.org

Jay B.Petersen SB# 111130
CALIFORNIA INDIAN LEGAL SERVICES
106 K Street, Suite 300
Sacramento, CA 95814
Telephone: 916 978-0960
jpetersen@calindian.org

Attorneys for Plaintiff
California Indian Legal Services

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| CALIFORNIA INDIAN LEGAL SERVICES<br>Plaintiff,<br>vs. | ) | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION and NATIONAL ARCHIVIST BRADFORD WILSON, IN HIS OFFICIAL CAPACITY<br><br>Defendants. | ) | Case No.:<br><br>The Honorable |

1. On July 6, 2026, plaintiff California Indian Legal Services ("CILS"), received a call from a California Native American woman who shared that while she was researching her native

ancestry at the Archives at San Bruno, California, ("San Bruno Archive," or "Archive,") she was told that it was closing and all the records were going to be moved to some unknown location. The caller wanted CILS to stop the closure. The facility at San Bruno serves as both a National Archives and a Federal Record Center, both of which are overseen by the National Archives and Records Administration.

2. CILS could find no formal public announcement from defendants, National Archive and Record Administration ("NARA") and Bradford Wilson, regarding the closure of the Archive. After searching NARA's website for information which yielded no results, CILS found a statement from NARA in a June 2, 2026 news article concerning federal employees being displaced by the closure of the Archives.[1] Beyond the discussion of the Archives' federal employees' union negotiations, there was no mention of when the closure would occur, where documents would be relocated, and important to CILS, why California Tribes were not consulted with before NARA made is decision to close the San Bruno Archive per NARA's internal Tribal Consultation Plan (policy).

3. Since the initial June 2026 article, CILS has filled in some of the blanks left by NARA. Tribal and Native American documents (Record Group 75) will transfer from the San Bruno Archive to the National Archive in Denver, Colorado.[2] NARA held "Listening Sessions" with

[1] Drew Friedman, *National Archives to Transition Out of Three Centers*, Federal News Network (June 25, 2026), https://federalnewsnetwork.com/facilities-construction/2026/06/national-archives-to-transition-out-of-three-federal-records-centers/.

[2] *Research Updates*, National Archives https://www.archives.gov/research/news. Relevant here, (NARA) will close the National Archives at Chicago/Chicago Federal Records Center (FRC) and the National Archives at San Francisco/San Bruno.Record Group 75 currently located at the National Archives at San Francisco will be relocated to Denver, Colorado.

Tribes on October 13th and 15th to share information on its decision to close the Archive and to learn (after the fact) from Tribes and their representatives, the impacts of its decision.[3]

4. Not until October 5, 2026, did CILS learn of NARA's formal justifications for closing the archives. In a response to House Representative Mullin (District Representative for San Bruno) NARA claims that the Federal Records Center ("FRC") has underutilized space due to the "government's transition to electronic recordkeeping" and the high costs associated with maintaining and operating the San Bruno building.[4]

5. CILS, its client Tribes and Native Americans, has relied on the San Bruno Archive for over 50 years. For the past several decades federal policy concerning closure and disposing of a federal building that the public had a strong interest in, required public notice, engagement with local governments and the public, as well as consideration of accessibility to services disrupted by the closure. In 2025, there was a shift in policy and regulations eliminating public notice, engagement and consideration of accessibility from the decision making process to vacate and dispose of a federal owned building. When the public has come to rely on a policy that is later dramatically changed the implementing agency must consider the public's reliance on former polices and offer reasonable alternatives to closing of a federal building. NARA's decision to close the San Bruno Archives did not evaluate or consider the reliance that CILS and others have on the San Bruno Archives nor has NARA offered any alternatives to closing the facility and relocating archival documents. Further, NARA's closure decision is inconsistent with its stated mission and vision as the custodian of the peoples documented history.

---

[3] *Researcher Updates*, National Archives https://www.archives.gov/research/news.
[4] Available at: https://kevinmullin.house.gov/wp-content/uploads/2026/10/NARA-Closure-Response-Letter-10.5.26.pdf

6. NARA's monumental decision to close the Archives without a full cost analysis, factual details on the reduced FRC storage capacity at San Bruno or consideration of cost burden on legal researchers like CILS, Tribes, the indigenous people of California, and others, violates the Administrative Procedures Act ("APA") as a final agency decision that is arbitrary, capricious, and an abuse of discretion. § 5 U.S.C. § 706(2)(A). CILS, seeks an order declaring that NARA's decision to close the San Bruno Archive violates the APA and must be enjoined from further actions to consummate the closure of the Archives.

**JURISDICTION**

7. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 702. The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202.

**VENUE**

8. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). CILS operates two field offices, 2355 Central Avenue, Suite C, McKinleyville, California and 106 K Street, Suite 300, Sacramento, California. These CILS offices serve Tribes and Native Americans residing with 15 counties within geographic location of the Court. Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c) because CILS' claims are district-wide and a substantial part of the property that is the subject of the action is situated in San Francisco, California.

## PARTIES

9. CILS is a federally chartered non-profit, community-based law firm, established in 1967, which provides free and low-cost legal services to California Tribes and Native Americans. It has four offices regionally located in northern, central, eastern, and southern California to assist Tribes and individual Native Americans with legal issues involving questions of federal Indian law. CILS' principal Office is in Sacramento, California. To meet the legal needs of its clients, CILS has relied on and continues to rely on physical access to the historical tribal and relevant government agency documents and records stored at the San Bruno Archives. CILS brings this action to protect its interests in the archival records that are needed in timely performing its legal representation of California Tribes and Native Americans which can only be achieved by ensuring local, physical access to archival documents and records for CILS, California Tribes and Native people.

10. Defendant NARA is an independent agency of the Executive branch of the United States government, and is responsible for maintaining, preserving and making federal documents and records available and accessible to the public through the operation of the National Archives.

11. Defendant Bradford Wilson is the National Archivist of the United States and the official in charge of NARA. Archivist Wilson is sued in his official capacity.

## SUMMARY OF FACTS

12. For nearly 60 years CILS has served as a non-profit legal services law program primarily representing individual Natives, groups and Tribes who are at or below the federal poverty level or composed of Native people at or below the poverty level and unable to retain

counsel. We are the only statewide, stand-alone Indian legal services program in the United States dedicated exclusive to the unique legal needs of the California Native community.

13. CILS' work relies on physical access to Tribal and Native American documents held at the San Bruno Archives. Some of CILS' most high profiled work for Tribal and Native American could not have been accomplished without the documents held at the Archive.

a. **Advisory Council on California Indian Policy Report ("ACCIP Report")**. Congress enacted the Advisory Council on California Indian Policy Act in 1992 to address the unique legal needs of the California Native community. CILS represented the Council and provided it with the historical documentation for its Final Report to Congress in 1997. This report is the only official document establishing the analytical framework for describing the unique needs of California Native people, the historic circumstances giving rise to these needs and proposing solutions to address those needs. *Advisory Council on California Indian Policy, Final Reports and Recommendations to the Congress of the United States*, Public Law 102-416 (September 1997)[5]. This Report would have been nearly impossible without physical access to the San Bruno Archives. CILS and others addressing Tribal and Native American historical background reference and quote statements from or based upon the ACCIP Report.[6]

---

[5] *ADVISORY COUNCIL ON CALIFORNIA INDIAN POLICY FINAL REPORTS AND RECOMMENDATIONS TO THE CONGRESS OF THE UNITED STATES PURSUANT TO PUBLIC LAW 102-416*, California Truth and Healing https://catruthandhealing.com/wp-content/uploads/2021/05/accip_final_reports_pursuant_to_public_law_102-416_executive_summary_september_19971.pdf.

[6] Exhibit A: Declaration of Jay Petersen, CILS Attorney

**b. Restoration of California Tribes.** Under the California Rancheria Act of 1958 (Act) as amended in 1964, 41 Tribes were slated for termination, 38 were terminated. CILS set out to restore these Tribes' legally protected political status lost under termination and exemplifies our need to physically access records at the San Bruno Archives. CILS successfully restored 27 of the 38 terminated Tribes.

The Act sought to end the legally established and recognized trust relationship between the select Tribes and the United States but only after the Tribes were prepared for the end of both federal supervision and benefits. The United States immediately began to develop so-called distribution plans that would control the conveyance of Tribal lands and end the political status of Tribal members. By its terms, preparation included road construction and other infrastructure improvements, including sewer and water systems and education and training for livelihoods and civic participation.[7]

The Act required Tribes to consent to termination. Termination under the Act was permissive only. It required a Tribal majority vote approval, and the United States was powerless to override a rejection. Under the 1964 amendments, a majority of each Tribe, excluding the original 41, had to request termination at the very outset of the process.

CILS lawyers and staff reviewed documents only accessible through the San Bruno Archives and concluded, as described in the ACCIP Report, that the United States misrepresented and, in some cases, fraudulently represented termination to the Tribes claiming

[7] *ADVISORY COUNCIL ON CALIFORNIA INDIAN POLICY FINAL REPORTS AND RECOMMENDATIONS TO THE CONGRESS OF THE UNITED STATES PURSUANT TO PUBLIC LAW 102-416*, California Truth and Healing,12-13. https://catruthandhealing.com/wp-content/uploads/2021/05/accip_final_reports_pursuant_to_public_law_102-416_executive_summary_september_19971.pdf.

termination as an accomplished fact and that voting to accept termination was their best way to ensure some measure of federal assistance as the United States ended their trust responsibility to California Tribes.[8]

In a single class action, CILS restored the pollical existence to 17 Tribes. *(Hardwick v. United States*, C-79-1710 (ND Cal. 1983) (SW). Other Tribes were restored through both litigation (e.g. *Table Bluff Band of Indians, v. Watt*, 532 F. Supp. 255 (ND Cal. 1981); *Scotts Valley Band, et al., United States,* No C-86-3660 (ND Cal. 1986) (VRW)) and by legislation (e.g. *Paskenta Band Restoration Act* 25 USC §1300m et seq.[9]

This entirety of the Termination Act's process could only be fully understood and compliance assessed with physical access to the foundational documents underlying that process.

For those Tribes slated for termination, their documents are contained in the San Bruno Archives as "Record Group 75" now destined for Denver, CO.

Held at the Archives are 2,500 cubic feet of Tribal and Native American documents with each cubic foot representing tens of thousands of pages of material, being transferred to Denver and at some unknown time in the future transferred for digitizing presumably at the Digitization Center in College Park, Maryland. These documents contain the legal descriptions of parcels that were conveyed to Tribal members in fee simple, the United States prepared draft distribution plans, Tribal meeting notes where the plans were reviewed and approved in the presence of United States officials, correspondence between the United Sates, Tribal officials and individual

---

[8] *Id* at 12,13

[9] Exhibit A: Declaration of Jay Petersen, CILS Attorney

Tribal members, vote tallies on plans and post-termination organizational documents, and many more "meta-data documents".

The Archives hold other irreplaceable documents essential to the California Native community whose value depends on their meta-data aspects only practically available through actual physical inspection. These documents include the California census rolls and field notes complied under the California Indians' Jurisdictional Act of 1928 and the Indian Claims Commission Act of 1946. The United States prepared these rolls for compensation for land taken and benefits lost because of the United States' failure to ratify 18 negotiated treaties with California Tribes. These census rolls purport to represent all Native people residing in California on June 1, 1852. The rolls are routinely used to determine eligibility for federal benefits reserved exclusively for Native people and for Tribal membership based on lineal descendancy from individuals identified in the census rolls. (See, 25 U.S.C. §1679 California Indians eligible for Indian health care based on being a descendant of an Indian residing in California on June 1, 1852).

**c. Petitions for "Fee-to-Trust."** Beyond the restored Tribes' documents, the San Bruno Archives currently holds permeant records for 59 of the 109 federally recognized Tribes in California. None of the Tribal documents at the Archive have been digitized and access is limited to physically viewing the document. Losing this physical access would limit CILS' ability to timely prepare its Tribal clients' petitions for placing tribally owned fee lands into trust through the Bureau of Indian Affairs ("BIA") transfer process. A "fee to trust ('FTT')" petition requires a Tribe to establish that it was "under federal jurisdiction" in 1934. Meeting this requirement has and does require CILS and Tribes to review archival documents dating back to 1934 and earlier. Requiring CILS or a tribal representative to travel to Denver CO to view documents to support a

FTT petition is cost prohibitive for CILS as a non-profit and for Tribes with little to no economic means.

**d. Petitioning for Federal Recognition.** There are 62 unrecognized Tribes in California. While not all unrecognized Tribes seek federal recognition under 25 C.F.R. Part 83, CILS has and does assist Tribes that embark on this long and extensive process. Federal recognition regulations, administered by the Office of Federal Acknowledgment ("OFA") under the BIA, requires petitioners to produce documentation from 1900 to the present showing that they were and are a "distinct community" (e.g. externally acknowledged, maintained political influence, the historical members of the Tribe, etc.). CILS, working with tribal members and researchers (usually volunteers), relies on the Archive for most of the documents needed to meet the OFA's regulatory requirements. While some information can be gained through other sources, the Archives hold the historical boarding school records, official BIA communication with the Tribe dating back to 1900 and earlier, Indian allotment records, and internal government communication regarding the Tribe that are discoverable only through the Archives' BIA records.[11]

**f. California Public Domain Allotments**. The General Allotment Act of 1887 authorized the setting aside of individual parcels of land from the public domain as allotments for Native people not living on reservations. In 1910, a separate law authorized the setting aside of land from national forests as possible allotments for Native people.

---

[11] Exhibit B: Declaration for Dean Tonenna, Mono Lake Kootzaduka's Tribal Elder.

At one time, there were more than 2,500 public domain allotments ("PDA") in California encompassing more than 336,000 acres. Today, there are 268 PDAs comprising about 17,400 acres. These PDAs are scattered throughout California but are most prominent in central and eastern California. Many, if not most, PDAs are held by California Natives who are not members of any federally recognized Tribe. Even though PDAs are held in trust by the federal government, the BIA expends little money or resources addressing the issues facing the allottees such as trespass on their land and issues of access (many PDAs are landlocked).

In 2021, CILS helped organize PDA allottees and formed the California Public Domain Allottees Association ("CAPDAA"). One of the first goals of CAPDAA was to collect the historical and legal documents of the PDAs throughout the state. CILS, along with CAPDAA members conducted research at the San Bruno Archives which holds the PDA records and documents. This research produced maps, land descriptions, title records, and other valuable information.

The San Bruno Archives holdings are also essential to an upcoming CAPDAA project that will document the ways in which more than 315,000 acres of allotment land were lost not including National Forest allotments. These documents for Public Domain and National Forest allotments are available only through the San Bruno Archives and we will need physical access to these Record Group 75 files for legal assessment about the context in which this acreage was lost—shady practices, less than arm's length dealings, factual and legal misrepresentations and other predatory practices. We will also legally evaluate the potentially hundreds of applications involving thousands of acres for National Forest allotments stored in the Archives and never processed.[12]

[12] Exhibit C: Declaration for Marty Meeden, Chairman of CAPDAA.

**g. Representation of Native Americans.** CILS' work with individual California Native Americans also leads CILS, and in one case the BIA, to the San Bruno Archives. Illustrative of the need to have access to the San Bruno Archives is a case involving a CILS client with an allotment that required BIA confirmation that the land was still held in trust status. CILS' client came to CILS concerned that non-Indians were residing on his allotment. After several communications with the BIA Central Agency office and acquiring a Title Status Report, it was confirmed that the allotment was still in trust status.

After notifying the non-Indian residents of their trespass, the local Title Company representing the residents provided CILS with 1948 documents showing the allotment had been removed from trust status and that the fee parcel had been subdivided and legally sold to the current residents. CILS contacted the BIA to confirm the documents submitted from the Title Company and was informed that BIA would need to search the San Bruno and Riverside Archives to verify the documents we had submitted.

Almost one year (11 ½ months) later the BIA notified CILS that its search resulted in no documents verifying the Title Company's documents, but that the BIA would accept the Company's documents as valid and remove our client's allotment from trust status. An 11 ½ month wait to search documents in California Archives only adds to the concern that BIA requests for documents in an Archive over 1,000 miles away will take even longer.

14. While digitizing all permanent Archive documents is the intent of NARA, the reality is this herculean undertaking will take several, if not more, years to accomplish. In the meantime, CILS, California Tribal and Native American documents will be physically out-of-reach and inaccessible. Relying on the BIA to request a search does not appear to expedite or be

given priority by an Archive. An 11 ½ month search time is unreasonable and unacceptable.[13]

15. The transfer of records and the closure of the Archives will materially obstruct CILS' ability to represent Tribes and the statewide Native community and fulfill our non-profit purpose. Access to "digitized" copies is not sufficient for CILS' s work. Digitized documents deprive us of access to address the contextual data needed to understand the complete historic context of a legal event. Reliance on digitized documents inhibits CILS' ability to fully assess factual and legal misrepresentations, failures to disclose material facts, and evaluate less than arms-length negotiations/transactions and other scrupulous practices that can cloud and undermine honest and transparent decision-making circumstances, making them legally suspected and challengeable.

## **LEGAL ARGUMENT**

16. NARA is the record keeper for the citizenry. In its May 30, 2026, *FY Congressional [Budget] Justification*,[14] NARA presented to Congress that:

> "The vision, mission, and strategic goals confirm NARA's commitment to openness, transparency, and citizen engagement through public access to government records. NARA's strategic framework adds context and a higher purpose to NARA operations, drives increased coordination between NARA programs, and sets priorities for improved resource allocations.

MISSION

*We will preserve the records of the United States and make them available to the American people.*

VISION

*We will embrace a shared commitment to transparency by opening access to records – physical or digitally – and engage in opportunities to share records widely in order to bring the American people closer to their history and story.*

---

[13] Exhibit D: Declaration for Michael Godbe, CILS Attorney.

[14] *National Archives FY 2026 FY 2026 CONGRESSIONAL JUSTIFICATION*, National Archives (May 30, 2025), https://www.archives.gov/files/about/plans-reports/performance-budget/2026-nara-congressional-justification.pdf.

STRATEGIC GOALS

NARA's strategic goals identify the four key areas in which NARA must excel in order to efficiently and effectively deliver its mission in a modern environment.

> *1. Discover, access, organize, process and make historical materials available to all Americans to the maximum extent possible.*
>
> *2. Ensure the highest standards of preservation are being applied to NARA's holdings, preserving American history for future generations.*
>
> 3. *Share NARA's holdings with the American people and the wider world in bold and creative ways. Celebrating the Semi-quincentennial in 2025 and 2026 is excellent example of an opportunity to put this priority into action.*
>
> 4. *Continue modernization of federal records management and digital preservation of archival electronic records*

17. NARA's stated mission, vision and Strategic Plan is consistent with the congressional purpose for the establishment of the agency dating back to 1934. While NARA became an independent agency from the General Administrative Service in 1984 under the National Archives and Records Administrative Act (Pub. L. No. 98-497, 98 Stat. 2280), the Act maintained NARA's core function to collect, manage, and preserve the government's records for public.[15] According to NARA's reorganizational structure it is founded on:

> "NARA's organizational structure focuses agency resources and management attention on delivering coordinated and effective services to key stakeholders and customers. NARA's customer-focused organizations allow the agency to better engage its stakeholders, encourage their collaboration and participation, and respond to their needs expediently and efficiently. This structure optimizes operations by reducing managerial layers, grouping functions, and streamlining operations to improve efficiency and enhance NARA's service to the public."[16]

---

[15] National Archives and Records Administration, codified in large part under 44 U.S.C. §§ 2104,2107(a)(3),2109, 2114, and 2203(g)(1) (Pub. L. 90–620 1968).
[16] *Id*. at 4.

18. NARA's decision to close the San Bruno Archive without stakeholder engagement, collaboration, and participation clearly does not respond to the needs of those who rely on the Archive in an expeditious and effective manner. NARA's decision will result in the constructive denial of plaintiff's access to the documents necessary to provide effective legal services to its Tribal and Native American clients. NARA's decision is inconsistent with its authorizing legislation, mission, vision, and 2026 Strategic Plan. NARA's action is arbitrary, capricious and an abuse of its agency discretion.

## A. CLAIMS OF UNDERUTILIZED SPACE IS NOT JUSTIFICATION FOR CLOSING SAN BRUNO ARCHIVE

19. A justification for NARA's need to close San Bruno Archives is that with advent of the digital age, physical storage for federal agencies' paper (analog) documents and records is increasingly unnecessary. NARA cites to Office of Budget and Management ("OMB") Memorandum M-23-07 to stress that all federal agency documents must be submitted to NARA in electronic form as of 2024. Accordingly, this mandate has resulted in less need for FRC storage. Because the San Bruno building houses both a FRC and an Archive, the reduction in FRC storage space has resulted in an overall underutilization of the building.

20. NARA offers no factual information or data to support its FRC claim at San Bruno. While this justification is certainly NARA's goal and objective, the reality is to the contrary. Simply transitioning to electronic records does not automatically eliminate the need for FRC storage of federal agency documents.

21. To understand the purpose of a FRC, it is important to understand what federal documents are in storage. Federal agencies generate internal documents concerning agency

functions and operations but also receive external documents from the public depending on the agency's function. This distinction is captured in a recent Bureau of Trust Funds Administration's ("BTFA") Tribal Consultation notice to Tribes informing them that it is updating its Indian Affairs "Records Schedule". BTFA groups the agency's documents into seven categories. The documents in each category are described in general terms, for example category 0001 documents are described as routine documents for administrative support or program activities and do not warrant permanent retention after 25 years. Other documents are described as containing historically significant events and decisions across Indian Affairs' and include "Agreements covered under this item include any treaty, convention, or cooperative agreement to which the United States is a party and for which DOI or its component bureaus or offices hold substantial implementation responsibilities" making these documents presumably "permanent" and retained indefinitely once moved over to the Archives. [17]

22. Each category of federal agency documents has a "shelf-life" depending on the document set. If the document is labeled "temporary" it means it holds no intrinsic value. As presented by NARA it suggests that federal agencies' current documents will be electronically submitted to NARA via the Electronic Records Archives ("ERA") 2.0 system and the paper or "source" document will no longer need to be retained (need not be stored). This is not the case; even "temporary" documents must be retained until they are made part of the agency's Records Schedule ("Schedule") which is prepared every five years. These Schedules are submitted to NARA for approval. (36 C.F.R. § 1225.1 et. seq and 36 C.F.R. § 1236.30 et. seq). Under this

[17] *Indian Affairs Records Schedule – Trust, Tribal Government, and Program Records (Record Group 75)*, Bureau of Indian Affairs (Sept. 25, 2026), https://www.bia.gov/sites/default/files/dup/tcinfo/rg_75_schedule_draft_solversion.pdf.

process, even if electronically submitted, an agency's "temporary" paper/source document must still be retained (stored) for a period established under its Schedule.[18]

23. The scanning of federal agency "permanent" documents is addressed under 36 C.F.R. § 1236.40. While these documents are required to be electronically scanned and submitted under the ERA 2.0 system, their retention period is indefinite and held in storage until absorbed into the Archives[19]. Under §1236.40 (g), agencies are informed that:

> "(g) This subpart also does not address other business needs or legal constraints that may make it necessary for an agency to retain (permanent) source records for a period of time after digitizing. Agencies should work with their legal counsel and other officials to determine whether such retention might be necessary because it relates to rights and interests, appeal rights, benefits, national security, litigation holds, or other similar reasons."

24. Under NARA guidelines, "permanent" documents should be retained indefinitely if they have "intrinsic value." Factors that NARA looks to are:

- Physical form that may be the subject for study if the records provide meaningful documentation or significant examples of the form;
- Aesthetic or artistic quality;
- Unique, curious, or historical physical features or formats;
- Age
- Value for use in exhibits
- Questionable authenticity, date, author, or other characteristics that is significant and ascertainable by physical examination[20].

[18] *Current Records Schedule*, National Archives Federal Records Management (Oct. 23, 2024), https://www.archives.gov/records-mgmt/grs.html.

[19] Michigan State University College of Law, *Indian Affairs Records Schedule; A Preliminary Record-by-Record Comparison of Current and Proposed Retention Policies*, Indigenous Law and Policy Center 1-28 (2026).

[20] National Archives Federal Records Management (Sept. 20, 2007), https://www.archives.gov/files/about/policies/nara1441.pdf.

25. A reduction in file storage at the FRC maybe the product of older “temporary” documents having reached their retention deadline, not because of the new electronic document mandate requirements placed on federal agencies. NARA does not explain whether the reduction in FRC occurred before or after its decision to close the San Bruno Archive, leading one to wonder whether the moving of FRC documents out of San Bruno was done to support an argument for underutilized space at the facility. There is no cost analysis for moving those documents to another FRC or returning them to the federal agencies who own the documents for agency storage at some other undisclosed facility.

26. Additionally, “permanent” documents and records are also held in FRCs until such time they can be accessioned (transferred) to the Archives where they will be held indefinitely. What is not clear from NARA’s claim of underutilization is what storage will continue to be needed to hold more current federal agency source documents (both “temporary’ and “permanent”) after electronic transfer pending an expiration of a documents retention date or accessioned into the Archives.

27. Finally, NARA has failed to address in its decision making that in its quest to transition to electronic documents, will these documents be available to the public in an “efficient and effective” manner, NARA’s Office of Inspector General (“OIG”) says no. In a 2025 NARA Audit Report, OIG found that the ERA 2.0 system to be insufficient to absorb the massive number of documents being electronically transferred from federal agencies. OGS concluded that the ERA 2.0 system could not manage the volume of documents and that:

> “NARA needs to improve its preparedness to accept electronic records with the Electronic Records Archives (ERA) 2.0 system. NARA does not presently have the technical capability to ingest large data sets of electronic records, including those that have already been accessioned. Without sufficient ERA 2.0 infrastructure, scalable upload processing

capabilities, and the ability to handle large file sizes, NARA's capacity to respond to record requests effectively and efficiently is significantly reduced."[21]

28. The OIG audit instills little confidence in NARA's ability to adequately absorb and make available current electronically created federal agency documents, temporary or permanent. The failure of the ERA 2.0 system demonstrates that poor planning and perhaps unrealistic expectations can result in unintended consequences.

29. With NARA's repeated claim that CILS, Tribes and Native Americans will have continued access to San Bruno archival documents once moved to Denver because the documents will be, at some unknown date, digitized and available online is unrealistic, irrational, or not supported by any evidence, data, or documentation from NARA. CILS fears that the future promise of digitizing archival documents needed to represent its clients and communities being accessible and available online could suffer the same fate at the failed ERA 2.0 system.

30. NARA's decision to close the San Bruno Archive, because storage needs at the FRC housed in the same building will no longer be needed to store federal agency documents without more is arbitrary, capricious, and an abuse of its discretion. As shown above, a federal agency's transition to electronic recordkeeping does not automatically eliminate the millions of paper records already sitting in FRCs. NARA has demonstrated only that it wishes to consolidate storage, not that the San Bruno facility itself lacks a continuing need.

### B. THE SHIFT IN FEDERAL PROPERTY MANAGEMENT REQUIRES NARA TO CONSIDER PLAINTIFF'S RELIANCE ON PRIOR POLICY AND OFFER ALTERNATIVES

[21] *Audit of NARA's Compliance with Office of Management and Budget Memorandum M-23-07*, National Archives (Sept. 8, 2025), https://www.oversight.gov/sites/default/files/documents/reports/2025-09/OIG%20Audit%20Report%20No.%2025-AUD-04.pdf.

31. For decades, federal agencies, local governments, tribes, preservation organizations, researchers, and the public operated under a framework in which federal facility citing decisions were expected to consider historic properties, central business districts, community impacts, and consultation with the public and local officials. Those expectations were met in Executive Orders 13006 (1994) and 12072 (1998) and later incorporated into the 2024 version of 41 C.F.R. Part 102-83.

32. In April of 2025, the President issued Executive Order 14274 "Restoring Common Sense to Federal Office Space Management" repealed Executive Orders 12072 and 13006 and directed the GSA to amendment 41 C.F.R. Part 102-83.[22] GSA has repealed and reserved Part 102-83. (90 Fed. Reg. 58408 (Dec. 16, 2025)).

33. The shift in federal property management and facility closure and disposal policy which once involved community engagement and weighing issues of accessibility, is now governed by agencies selecting the most "cost-effective facilities" and there are no regulations to guide agencies in making the selection except cost savings. Agency decisions made under a shift of policy and repeal of controlling regulations, must consider both "serious reliance interests" engendered by that policy and "reasonably obvious alternatives." *A.C.R. v. Noem,* 809 F.Supp.3d 103 (2025) citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009); *Yale-New Haven Hosp. v. Leavitt,* 470 F.3d 71, 80 (2d Cir. 2006). The court in *A.C.R.* held: "USCIS failed to consider reliance interests and reasonably obvious alternatives here, likely rendering its decision to rescind SIJS-DA arbitrary and capricious." *Id*. 121.

[22] *Executive Order 14274—Restoring Common Sense to Federal Office Space Management*, White House. gov (Apr. 15, 2025), https://www.govinfo.gov/content/pkg/DCPD-202500484/pdf/DCPD-202500484.pdf.

34. The San Bruno Archives has operated for over five decades. CILS has shown its reliance on having a northern regional archive in California to effectively represent Tribes and Native Americans. So too researchers have relied on in-person access to records; federal agencies rely on proximity to records and other communities rely on the long-standing Archive presence in the region. NARA's decision and justification do not address or mention the reliance factor of CILS, Tribes and Native people have on accessing the Archives.

35. NARA's decision further fails to offer reasonable alternatives to moving the Archives to Denver, except to say that "NARA's facilities in Southern California are not sized to absorb the San Francisco operations." There is no discussion concerning: leasing of the FRC space to another federal, state, local, or Tribal government entity which would provide a source of cash flow; moving the Archives to a different location within the region to reduce needed repairs to the current facility, partnering with state, local and Tribal governments to retain documents in university locations, the proposed California Indian Heritage Center or other accommodations. With the ultimate goal of selling the San Bruno facility, each of the options listed are viable from the proceeds the sale.

36.. NARA's decision to move the Archive and justifications fails to consider or address the reliance CILS, Tribes and Native Americans have on being able to access the records they need to document their history and meet the legal challenges of today. NARA's complete lack of possible alternatives for preserving the Archives in California can only be seen as NARA having acted arbitrarily, capaciously, and having abused its discretion in deciding to move the San Bruno Archive halfway across the country.

**C. NARA'S DISCRETION TO CLOSE THE ARCHIVES IS LIMITED BY THE TRUST DOCTRINE AND ITS OWN TRIBAL POLICES.**

37. Tribes share a unique and special relationship with the federal government. The government, as trustee of tribal lands and resources, has a fiduciary responsibility to Tribes and tribal people unlike any other minority group in the country. *U.S. v. Mitchell,* 463 U.S. 206, 225 (1983)(This Court has previously emphasized "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent [tribes] and sometimes exploited people.", citing *Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942)

38. The "trust doctrine" is a doctrine of the judiciary used to harness actions taken by the executive and legislative branches of the government and can be the basis for compensating wrongs or enjoining actions committed by those branches against the Indian people.

39. The "trust doctrine" has also been the centerpiece of several Executive Orders beginning with President Clinton's Executive Order 13175 "Consultation and Coordination with Indian Tribal Governments" issued on November 6, 2000.[23] This Executive Order required federal departments and agencies to consult with Indian tribal governments when considering policies and actions that would impact tribal communities. Although subsequent Presidents have issued their own versions of the federal government's trust responsibilities and obligations to Tribes, no President has repealed Executive Order 13175.

40. NARA's "*Initial Tribal Consultation Plan of Action*, April 26, 2021," states, it is required to "…prepare and periodically update a detailed plan of action to implement the policies and directives of Executive Order 13175." [24]

[23] *Executive Order 13175 - Consultation and Coordination with Indian Tribal Governments*, State.gov (Nov. 9, 2000), https://2009-2017.state.gov/documents/organization/136740.pdf.
[24] *National Archives and Records Administration Initial Tribal Consultation Plan of Action*, Archives.gov (Apr. 26, 2021), https://www.archives.gov/files/foia/pdf/initial-nara-tribal-consultation-plan-of-action-april-26-2021.pdf.

41. NARA's 2021 Consultation Plan further acknowledges that:

> "NARA is committed to honoring Tribal sovereignty and including Tribal voices in policy deliberation that affects Tribal communities. The federal government, and thus, NARA, has a Tribal trust responsibility, a legally enforceable fiduciary obligation to all federally recognized Tribes."

NARA's requirement for tribal engagement before taking actions that can negatively impact Tribal interests is further seen in its AC 27. 2021 "Memorandum To Agency Records Officers: New Scheduling Requirement for Tribal Consultation" directed to all federal agencies in preparing their "Records Schedules":

> "All records schedules originally certified and submitted on or after August 1, 2021, must be accompanied by additional information regarding Tribal consultations. Each records schedule submitted after this date must include a separate written communication (see below) indicating that the agency has undertaken Tribal consultations where needed as required under Executive Order 13175 Consultation and Coordination with Indian Tribal Governments."[25]

42. NARA's decision to close San Bruno Archives was made public in June of 2026. There was no Tribal consultation per NARA's policy prior to making that decision. California Tribes contacted NARA raising this issue on August 21, 2026, and August 22, 2026, respectively.[26] CILS also requested, through a Freedom of Information Act ("FOIA") information, among other things, on when and how Tribal consultation was held prior to its decision to close the Archives. CILS was informed that NARA would be unable to respond to CILS' FOIA request for 56 months.[27]

43. Having been made aware of its failing to consult with Tribes in advance of its decision to close the Archives, NARA has now circled back to hear Tribal concerns and

25https://www.archives.gov/records-mgmt/memos/ac-27-2021.

26 Exhibits E and F: CTCA and NCTCA letters from Tribal Chairpersons Assoc. to NARA.

27 Exhibit G: NARA FOIA Request Response

comments on the closure of San Bruno by holding two "Listening Sessions" October 13th and 15th 2026.[28] At the Listening Sessions, NARA stated that formal "consultation" will be scheduled at a later unannounced date.

44. NARA's commitment to the "trust doctrine" and its profound Tribal policies and agency directives, discussed above, strictly requiring Tribal engagement before it takes actions impacting Tribes, are not merely general statements of policy but create norms and effectively circumscribe its discretionary decision-making process. *Conservation Law Foundation of New England, Inc. v. Harper*, 587 F.Supp. 357,368 (1984) *citing* *American Bus Association v. United States*, 627 F.2d 525, 530 (D.C.Cir.1980), *quoting* *Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 667 (D.C.Cir.1978).

45. Failing to engage with Tribe before deciding and announcing its administrative decision to close the San Bruno Archive, NARA has abused its discretion in violation of the APA.

**D. COST SAVINGS TO NARA DOES NOT OFFSET THE COST OF ACCESS TO CILS, TRIBES AND NATIVE AMERICAN.**

46. A further justification offered by NARA for closing the San Bruno Archive rests on the need to dispose of the facility since it is one of the oldest and most expensive in NARA's portfolio. Annual saving is estimated to be more than $4.7 million with ancillary savings from personnel and avoidance for repairs and system replacement outlay by GSA.[29]

47. What NARA does not share: is the moving costs for transferring and relocating the San Bruno Archives documents over a 1,000 miles across the country (factoring in diesel prices);

[28] Exhibit H: Notice of Tribal Listening Sessions
[29] Available at: https://kevinmullin.house.gov/wp-content/uploads/2026/10/NARA-Closure-Response-Letter-10.5.26.pdf.

what additional expense will be needed for expanding or enhancing the Denver Archive in order to absorb the massive amount of records being transferred; what additional personnel will be needed at the Denver Archive to respond to the increase in requests from CILS, California Tribes and Native Americans; and cost saving from operating an Archive building owned by GSA (San Bruno Archive facility) versus a leased facility such as the Denver Archive.

48. NARA provided no information regarding the operation of the Denver Archive by which to evaluate whether its cost savings are actual or mere projections. CILS' online research shows that the Denver Archive holds records from seven states: Colorado, Montana, New Mexico, North Dakota, South Dakota, Utah and Wyoming. These states combined have 61 Tribes. Adding documents from 59 federally recognized California Tribes and 28 from Nevada will result in the Denver Archives holding 148 Tribes' documents. California unrecognized Tribes also have documents at San Bruno, which are not factored into the overall total count of California Tribal documents. This volume of new Tribal documents cannot be managed without increases in Archive staff. How much additional staff will be needed due to the increased volume in Denver is not revealed by NARA. Undoubtedly, CILS, California Tribes and Native Americans will have delayed and long wait times whenever documents are needed and requested from the Denver Archives.

49. NARA's need to save money is not supported by its 2026 Budget Request. NARA requested $414.7 million, nearly $60 million less than projected 2025 spending levels and $93 million less compared to 2024. It also included the elimination of 136 full-time employees. According to Jason R. Baron, a professor at the University of Maryland and former director of litigation at NARA:

> "NARA leadership's submission of a reduced budget for their own agency is difficult to fathom, given the enormous resource challenges NARA currently faces …These include

dealing with huge FOIA processing backlogs at presidential libraries, as well as putting in place both the people and the necessary technology to preserve and provide public access to the billions of records in electronic form coming to NARA from hundreds of government agencies."[30]

50. Professor Baron is correct that it is difficult to fathom that NARA submits a budget approximately $60 million less than the 2025 budget projection and at the same time argues for closing an Archive to save money. NARA's decision to close, for alleged cost savings, an Archive that holds so many important and critical documents for Tribes and Native American people, researchers like CILS and others, and countless other minority communities in California and the State itself, is neither rational or reasonable and is inconsistent with NARA's mission, vision and Strategic Plan to make governments records available and accessible.

## FIRST CAUSE OF ACTION

**Violation of the Administrative Procedure Act**

**NARA's Agency Action is Arbitrary, Capricious and Abuse of Discretion**

51. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

52. Defendant NARA is an "agency" under the APA. 5 U.S.C. § 551(1).

53. Defendants' decision to close the National Archives at San Francisco and transfer records from the facility constitutes a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.[31]

[30] Justin Doubleday, *Former Archivist Raises Red Flags Over NARA Cuts*, Federal News Network (June 20, 2025), https://federalnewsnetwork.com/budget/2025/06/former-archivist-raises-red-flags-over-nara-cuts/.

[31] On information and belief, NARA during Tribal "Listening Sessions" shared that the San Bruno Archive will close. Transfer of documents from the Archive has already begun with the transfer of records from the National Aeronautics and Space Administration ("NASA") being relocated to the National Archives at Fort Worth, the records will be inaccessible to the public

54. The decision is subject to judicial review because this agency action will result in plaintiff being deprived of its right to access public records needed for legal research and representation of its Tribal and Native American clients. *American Friends Service Committee v. Webster*, 720 F.2d 29, 37 (1983)

55. Under the APA, a court must set aside final agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). *Michigan v. EPA*, 576 U.S. 743, 758 (2015); see also *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29,50 (1983).

56. Courts consider "whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43).

57. Agency action must be viewed to determine whether considering policy shifts the agency weighed both "serious reliance interests" engendered by the policy and offered "reasonably obvious alternatives" by those impacted by the agency's action. *A.C.R. v. Noem,* 809 F.Supp.3d 103 (2025). The Court must also view whether the agency abused its discretion by failing to consider binding norms established through agency policy and directives. *Conservation Law Foundation of New England, Inc. v. Harper*, 587 F.Supp. 357,368 (1984)

58. Finally, agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of

---

starting October 13, 2026, until after they are transferred and processed at their new location. Available at: www.archives.gov/research/news.

the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.* Ass'n., 463 U.S. at 43.

59. Defendants' decision to close the San Bruno Archive and relocate records outside of communities of relevance is arbitrary and capricious under these well-established standards. Congress intended for the public "whose rights may have been affected by government actions to have access to the documentary history of the federal government." *Webste*r, 720 F.2d at 57. This is clear from provisions in the statutory scheme, see, e.g., 44 U.S.C. §§ 2104(d), 2107(a)(3), 2109, 2114, 2203(g)(1), and legislative history, see S. Rep. No. 98-373 (1984). NARA and the Archivist thus have an obligation under federal law to consider the public interest in making determinations about National Archives facility closures and records transfers.

60. In deciding to close the San Bruno Archives, defendants disregarded Congress's clear intent that the National Archives and its materials be maintained for the public's benefit. Beyond failing to provide sufficient notice of the closure to the public, defendants did not consult with Tribes before making its decision as required under NARA's policy.

61. Pursuant to 5 U.S.C. § 706(2)(A) and 28 U.S.C. § 2201, plaintiff is entitled to injunctive relief, a declaration that the decision to close the San Bruno Archive is arbitrary and capricious, and an abuse of its agency discretion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and grant the following relief:

1. An injunction preventing Defendants from closing the San Bruno Archive.

2. A declaration that Defendants' decision to close the National Archives in Bruno and relocate Tribal and Native American documents to Denver, CO unlawful and violates the APA.

3. An order vacating the decision to close the National Archives in San Bruno and prohibiting the relocation of Tribal and Native American records from the San Bruno facility.

4. Plaintiff's costs, expenses, and reasonable attorneys' fees; and

5. Such other relief as the Court deems just and proper.

DATED: 10/21/2026

RESPECTIVELY SUBMITTED

/s/ Dorothy Alther
DOROTHY ALTHER
CALIFORNIA INDIAN LEGAL SERVICES
DIRECTOR OF LEGAL IMPACT AND LEGISLATIVE AFFAIRS

/s/
JAY B. PETERSEN
CALIFORNIA INDIAN LEGAL SERVICES
SPECIAL PROJECTS ATTORNEY

ATTORNEYS FOR THE PLAINTIFF

**Exhibit A**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CALIFORNIA INDIAN LEGAL SERVICES<br>Plaintiff,<br>vs.<br><br>NATIONAL ARCHIVES AND RECORDS ADMINISTRATION and NATIONAL ARCHIVIST BRADFORD WILSON, IN HIS OFFICIAL CAPACITY<br><br>Defendants. | DECLARATION OF JAY B. PETERSEN |

I, Jay B. Petersen, declare:

1. I am Jay B. Petersen. I am over the age of 18. I have personal knowledge of the facts contained in this declaration.

2. I make this Declaration in support of Plaintiff identified in the above caption.
3. I am an attorney with California Indian Legal Services (CILS). I have personal knowledge of the facts contained in this declaration unless stated on information and belief and as to those matters, I believe them to be true. If called upon to testify I could and would testify competently to the truth of the facts stated herein unless stated o information and belief and as to those matters, I believe them to be true.

4. CILS is a non-profit legal services law program primarily representing individual Natives, groups and Tribes who are at or below the federal poverty level or composed of Native people at or below the poverty level and unable to retain counsel. We are the only statewide, stand-alone Indian legal services program in the United States dedicated exclusively to the unique legal needs of the Native community.

5. I have worked as an attorney with CILS for over thirty years. My practice includes a wide range of issues including litigated and legislative Tribal political restoration, Tribal federal recognition under 25 CFR §83 et seq. and legal issues involving public domain and national forest allotments in California. All these practice areas require physical access to archival records.

6. There are one hundred nine federally recognized Tribes and California, at least sixty two unrecognized Tribes, and is home to over 750,000 Native people. On all counts, California has more Tribes, recognized and unrecognized, and is the home to more Native people than any other State in the United States. The San Bruno archives house documents (Record Group 75 2,500 cubic feet) critical to the history, existence and day-day work and life of all these Tribes and peoples

7. As an example, the termination of forty-one Tribes under the California Rancheria Act of 1958 (Act) as amended in 1964 prompted CILS' non-profit incorporation and our work in restoring Tribes their legally protected political status lost under termination.

8. In a single class action, CILS restored the pollical existence to seventeen Tribes. *(Hardwick v. United States*, C-79-1710 (ND Cal. 1983) (SW). Other Tribes have been

restored through both litigation and legislation.[1] In the ensuing years, CILS has worked extensively assisting California Native communities with the restoration of their political status.

9. In 1992, Congress enacted the *Advisory Council on California Indian Policy Act* in 1992 to address the unique legal needs of the California Native community. CILS represented the Council and authored their Final Report to Congress in 1997. This report is the only official document establishing the analytical framework for describing the unique needs of California Native people, the historic circumstances giving rise to these needs proposing solutions to address those needs. *Advisory Council on California Indian Policy, Final Reports and Recommendations to the Congress of the United States, Pursuant to Public Law 102-416* (September 1997).[2]

10. The ACCIP report, and CILS' work in restoring terminated Tribes their federal political status, would have been nearly impossible without physical access to the San Bruno archives.

11. The NARA San Bruno archives store original documents that corroborate and contextualize the theft of millions of acres of land from Tribes and the loss of political the

[1] *Table Bluff Band of Indians, v. Watt*, 532 F. Supp. 255 (ND Cal. 1981); *Scotts Valley Band, et al., United States* No C-86-3660 (ND Cal. 1986) (VRW), *Paskenta Band Restoration Act* 25 USC § 1300m et seq.

[2] *ADVISORY COUNCIL ON CALIFORNIA INDIAN POLICY FINAL REPORTS AND RECOMMENDATIONS TO THE CONGRESS OF THE UNITED STATES PURSUANT TO PUBLIC LAW 102-416*, California Truth and Healing https://catruthandhealing.com/wp-content/uploads/2021/05/accip_final_reports_pursuant_to_public_law_102-416_executive_summary_september_19971.pdf.

political identities of thousands of Native people.[3] Physical access to archival documents is essential to CILS' representation of our client community. This kind of access allows us to fully assess factual and legal misrepresentations, failures to disclose material facts, to evaluate less than arms-length negotiations/transactions and other sharp practices that cloud and undermine honest and transparent decision-making circumstances making them legally suspect and challengeable.

12. Public records can show nominal compliance with legal and policy mandates, but a full assessment of their context through physically accessible archival data--meeting notes, correspondence, side-agreements, transcripts, signatures and photographs, calendars and receipts—can show the opposite. This is basic legal, historical research essential to CILS' work. Hypothetical access to electronic scans at some incalculable future time does not substitute for physical access to this kind of material. Travelling more than a thousand miles for a week at a time does not cure this problem. That is not reasonable physical access to key documents and Tribal narratives. It is the thoughtless and shameful theft of California Native history.

13. The NARA plan to move the records of one hundred nine Tribes and thousands of Native people from San Bruno to Denver perversely steals the historical corroboration of all those losses. This theft of their collective history is nearly as morally repugnant as the original theft itself.

---

[3] Heizer, R. F., Editor, Volume 8 *California Handbook of North American Indians, Smithsonian Institution Wahington* 701-712 (8th ed. 1978).

14. The San Bruno NARA facility stores these and other irreplaceable and otherwise publicly inaccessible documents essential to the California Native community whose value depends on their remaining practically available through actual, physical inspection. Among these are the California census rolls complied under the California Indians' Jurisdictional Act of 1928 and the Indian Claims Commission Act of 1946.

15. Sometimes the first inhabitants of California need to show that they are First Inhabitants. Census rolls purport to represent *all* Native people residing in California on June 1, 1852. The rolls are regularly used to determine eligibility federal benefits reserved exclusively for Native people, i.e., 25 USC Sec. 1679 and for Tribal membership based on lineal descendancy from individuals identified in the rolls. These and other documents housed at San Bruno are ancient and fragile and susceptible to damage and loss through scanning and transfer.

16. These include documents related to resource management and land acquisition to Tribal membership and federal program eligibility and issues such as federal recognized Tribal status, and political restoration through the federal recognition regulations. legislation or litigation.

17. NARA has not publicly disclosed when the digitization process or the transfer of records will begin. However, on information and belief, I represent that San Bruno staff have been instructed to divide their worktime equally between closure preparation and standard archive record management. This is a significant commitment of personnel resources to the transfer process and suggests that the scanning and/or record transfer has begun and underscoring the need for this litigation.

18. NARA does not have the capacity to digitize the scheduled volumes of materials they have been selected. [4] Ongoing digitization processes can prevent or substantially impair access to critical archival resources. NARA has no announced plans to hire or train more NARA staff at the Denver facility to steward and manage the California documents. Our client community is unable to travel to Denver to physically access their own records because of prohibitive costs and time requirements. Even if otherwise affordable, the proposed digitization of records may prevent any access to physical records. Even with physical access, lack of staff and staff training in Denver severely limit or undercut research time and effort.

19. The San Bruno archives also house other federal agency documents (Bureau of Land Management and United States Forest Service) central to day-to-day Tribal decision-making about natural resource stewardship and protection, fire prevention and control and land base expansion.  These Department of Agricultural agency documents are also set for transfer to Denver, Colorado.[5]

20. The closure of the San Bruno Archives will materially disrupt and harm CILS' ability to represent our client community and fulfill our non-profit purpose and will create a

---

[4] *Audit of NARA's Compliance with Office of Management and Budget Memorandum M-23-07*, National Archives (Sept. 8, 2025), https://www.oversight.gov/sites/default/files/documents/reports/2025-09/OIG%20Audit%20Report%20No.%2025-AUD-04.pdf.

[5] *Researcher Updates*, National Archives https://www.archives.gov/research/news. Relevant here, The National Archives and Records Administration (NARA) will close the National Archives at Chicago/Chicago Federal Records Center (FRC) and the National Archives at San Francisco/San Bruno FRC

substantial hardship on the entire California Native community to protect, advance and vindicate their legal, moral and historic rights.

This Declaration is signed under the penalty of perjury.

DATE: 10/20/2026

Jay B. Petersen

Jay B. Petersen

*Attorney, California Indian Legal Services*

**Exhibit B**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| CALIFORNIA INDIAN LEGAL SERVICES<br>Plaintiff,<br>vs.<br><br>NATIONAL ARCHIVES AND RECORDS ADMINISTRATION and NATIONAL ARCHIVIST BRADFORD WILSON, IN HIS OFFICIAL CAPACITY<br><br>Defendants. | ) | DECLARATION OF DEAN TONENNA |

I, Dean Tonenna, declare:

1. I am Dean Tonenna. I am over the age of 18. I have personal knowledge of the facts contained in this declaration.

2. I make this Declaration in support of Plaintiff identified in the above caption.
3. I am currently a Tribal Elder and the Vice President of our tribal non-profit which is the Mono Lake Kutzadika Indian Community Cultural Preservation. My duties are many and include engagement with other entities seeking to do business with my Tribe. I am heavily involved with research to support our petition for federal acknowledgement.

4. My name is Dean Tonenna. I represent the Mono Lake Kootzaduka'a Tribe of CA and NV.

5. Our Tribe is not yet federally recognized by the U.S. Government. We submitted a letter

of intent on July 9, 1976, to the Department of the Interior Branch of Acknowledgement and Research documenting our intent to submit a petition to the seeking federal acknowledgement. This task is arduous, time consuming, and expensive. Our Tribe is required to provide evidence to meet the criteria outlined in 25 C.F.R. Part 83.

6. Because my Tribe is located within California and Nevada, historical records about our Tribe are housed and curated by the National Archives and Records Administration located within two facilities at Riverside and San Bruno, California.

7. I have made four visits to Riverside and four visits to San Bruno with each visit requiring seven days. The research facility is open Monday – Friday, excluding federal holidays, and I travel to the facility location on Sunday and leave on Saturday to maximize my time in the archives. So far, this has resulted in travel amounting to 8 weeks or 56 days and I am still not finished and must revisit as soon as possible.

8. The cost of travel, lodging and living expenses are costly, requiring my Tribe to spend thousands of dollars for me to research the archives. As my Tribe is not yet federally recognized we have no dedicated source of income and must find funding to allow for me to engage in research.

9. This results in delays. To date, our Tribe has been working on our petition for federal acknowledgement for 50 years!!!! This is an extreme hardship as our Tribe must bear the burden of proof in all of the research and time spent in writing the petition. We must also engage with attorneys and other subject matter experts to assist with review and consultation on the petition. We must also engage with attorneys and other subject matter experts with review and consultation on the petition.

10. Our Tribe relies upon the staff and expertise found at Riverside and San Bruno. The records are complex and finding aids either do not exist or are so limited that we rely on NARA staff to help us find relevant records. It is necessary to view the paper records and

not rely on digital records. The files from BIA come as is. NARA staff do not alter or rearrange the files. There are instances of the paper records being mistakenly placed in other folders, some folders have errors in the file name, some of folders are missing information. To deal with these issues, I must carefully go through the contents to sort out the irregularities. One document may point to another box, series, agency, family, or place. That process depends upon sustained access to the collections and knowledgeable archival staff.

11. I have been looking through the BIA boarding school records to determine how many of the students are from my Tribe. As I do not have information on who from my Tribe has attended BIA boarding schools, I must go through each folder searching for evidence that would indicate the student was from my Tribe. The finding aids, if they exist, are too coarse in nature such that they are not as useful as one would hope. This requires that I search through every folder to find clues that will help me determine if the folder has information that would be important in my research. Some of the paper records are in poor shape with deteriorating paper, fading or bleeding ink, and illegible handwriting. I often must stare at the information sometimes pulling out a magnifying lens to finally make out what the information is communicating. This would be very difficult to do, if not impossible, if all I had to work with is scanned document imagery.

12. The closure of the San Bruno facility has greatly alarmed our Tribe. We oppose this planned closure and relocation of BIA records to the Denver facility. The great distance from our homeland to Denver would more than double our travel expenses. It would also take more time to drive to Denver, which is approximately 764 miles from Mono Lake,

California. Often our tribal elders must visit the archives with tribal staff as the elders are the ones who have the unwritten knowledge of our Tribe and tribal experiences. It is hard enough for tribal elders to travel to NARA facilities in California and it will be even harder for our tribal elders to travel to Colorado, and many will choose not to make the trip.

13. The disruption caused by packing, transporting, re-shelving, revising finding aids, and addressing reference backlogs may delay access at a critical stage of our acknowledgment work. Those delays could prevent us from following research leads, resolving evidentiary gaps, authenticating records, and preparing a complete petition. The relocation also removes records concerning California Indian peoples from the geographic, historical, and cultural communities to which they relate.

14. Our Tribe opposes the planned closure and any relocation that proceeds without prior, meaningful Tribal consultation. Consultation after a final decision has been made is not an adequate substitute. Before records are dispersed, affected Tribes should know, at the record-group and series level, where the materials will be housed, when they will be unavailable, and when fill access will be resumed.

15. We call upon NARA to pause the relocation of records potentially relevant to California Tribes and federal acknowledgment petitions until meaningful consultation has occurred. NARA should identify and prioritize records relevant to our Tribe, preserve their physical and intellectual integrity during the move, provide no-cost digitization and certified copies for acknowledgment research, maintain timely assistance from staff familiar with the collections, give advance notice of service interruptions, and establish a practical means for Tribal representatives to inspect original records without prohibitive travel.

NARA should also provide written assurance that relevant records will not be destroyed, deaccessioned, separated from related files, or made materially less accessible.

16. The federal acknowledgment process already places a substantial documentary burden on petitioning Tribes. The United States should not increase that burden by moving essential evidence farther from the people whose status, history, and rights the records may help establish. Continuous, affordable, and equitable access is not a matter of convenience for our Tribe; it is necessary to our ability to preserve our history and seek the federal acknowledgment to which a complete and fair record may entitle us.

This Declaration is signed under the penalty of perjury.

10/20/2026

Dean Tonenna,
Mono Lake Kootzaduka'a Tribal Elder

Exhibit C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

California Indian Legal Services,
106 "K" Street, Suite 300
Sacramento, CA 19814

*Plaintiff(s)*

vs.

National Archives and Records Administration

Office of General Counsel
National Archives and Records Administration
8601 Adelphi Road, NGC,
Room 3110
College Park, MD 20740-6001

*Defendant(s)*

Case No.:

**Declaration for Marty Meeden**

I, Marty Meeden, declare:

1. I am Mono Lake Paiute and Northern Washoe and am the Chair of a five-member Board of Directors for the California Public Domain Allottee Association (CAPDAA), a federal tax exempt, non-profit 501(C) (3) corporation organized in 2018**.** California Indian Legal Services(CILS) a community based 501 (C) (3) nonprofit legal services program helped incorporate CAPDAA and they currently represent the nonprofit.

2. At our regularly scheduled meeting on October 7, 2026**,** the Board unanimously authorized me to submit this declaration on CAPDAA's behalf to oppose to the San Bruno archive closure and records transfer announced in the NARA archives August 2026 Newsletter.[1]

3. We organized CAPDAA to help sustain and protect the aboriginal land base in California as environments. (Public Domain Allotments through public community education about their history in California, the rights of allotment stakeholders, the allotment trust management obligations of the United Staes and the emerging threats to the integrity of their natural environments. (The anecdotal evidence available to CAPDAA strongly suggests that the overwhelming majority of public domain allotment stakeholders are at or below the federal poverty guidelines.) Other primary goals include allotment of natural resource protection against neglect, exploitation, and misuse and the protection of natural resource habitats for traditional uses consistent with traditional Native practices especially against encroaching development, fire risk, and climate change. This habitat protection work required CAPDAA and CILS to update field ecology inventories first developed in 1994 so the inventories can help gauge the progressive effects of climate change. Nakamura, G. and Harris, H. R., *Natural Resources Inventories of Indian Public Domain Trust Allotments in California* American Indian Cultural Research Journal 21:3 (1997) pp. 49-61.

4. The Bureau of Indian Affairs (BIA) is the federal agency principally charged with managing public domain and national forest allotments throughout California. The BIA archives their

---

[1] [1]*Research Updates*, National Archives https://www.archives.gov/research/news. Relevant here, (NARA) will close the National Archives at Chicago/Chicago Federal Records Center (FRC) and the National Archives at San Francisco/San Bruno. All archival records currently located at the National Archives at San Francisco will be relocated to Kansas City.

permanent California allotment records at the NARA San Bruno facility as apart of Record Group 75 (Tribal/Native Records).

5. Other federal agencies, especially the Bureau of Land Management (BLM) and the United States Forest Service (USFS) archive their records permanently in the San Bruno facility that are essential to the achievement of our overall corporate purposes. Physical access to permanent records of all these federal agencies is central to our primary corporate goals and to the ability of CILS to help achieve them

6. The closure of the archives and the transfer of records will materially obstruct our ability to represent the statewide public domain allotment community and fulfill our non-profit purpose because physical access to the San Bruno archival records is central to the fulfillment of that purpose.

7. CILS advises us that there were at least 2552 original public domain allotments (160/80-acre land parcels distributed to eligible Native people from either the public domain or California national forests comprising 336,409 acres. Through CILS' work, CAPDAA knows that only about 268 allotments remain, totaling just over 17,000 acres. Since allotments were first distributed in the late 19th Century, the California Native community has stained a loss of over 300,000 acres of their aboriginal land base.[2]

2 Fontana et al., Fire Ecology, Restoration of Fire Sovereignty on California Indian Allotment Lands (2026) 22:98

8. As a part of our corporate public education mandate, CAPDAA has decided to determine just how these dramatic land base losses were sustained. The BIA, BLM and USFS records are essential to this determination. Therse permanent records all reside and only reside in San Bruno. Our CILS attorneys and their staff need physical access to these records to complete their work.

9. Physical access to these records involving the loss of more than 300,000 acres is central to our attorneys' and researchers' ability to fully assess possible factual and legal misrepresentations, failures to disclose material facts, and evaluate less than arms-length negotiations/transactions and other sharp practices that can cloud and undermine honest and transparent decision-making circumstances that could make them legally suspect and challengeable.

10. On information and belief, I state that when preparation for records transfers begin, CILS and their staff will not have physical access to any of these records until the transfer is complete. The transfer of records to Denver and the closure of the San Bruno facility will materially obstruct our ability to represent the statewide allotment community and fulfill our non-profit purpose. Physical access to original records in Denver given our non-profit status and the poverty demographics of the community we serve is a cost this nonprofit and community of stakeholders cannot sustain.

11. On information and belief, I state that some of the transferred records will be digitized. On that basis I also state that once the digitization process begins, we will be denied access to

any of the archived records until the NARA completes that process. NARA is currently neither staffed nor otherwise equipped to conduct an efficient digitizing effort that preserves the integrity of the original documents. This internally acknowledged deficiency will prohibit the physical access to the records we as a nonprofit and our attorneys need.[3]

12. Even if digitized efficiently and effectively, for our purposes, digitized copies are not sufficient for our work. Even a digitization process that preserves the integrity of the originals will deprive us of the kind of physical access we need to assess the contextual data surrounding the losses of over 300,000 acres of Native land base over a period of one-hundred years.

13. Closure of San Bruno will prohibit CAPDAA's and CILS' access to irreplaceable and otherwise publicly inaccessible documents essential to achieving our corporate purpose and representational needs through the only practically available physical inspection of original documents.

[3] *Audit of NARA's Compliance with Office of Management and Budget Memorandum M-23-07*, National Archives (Sept. 8, 2025), https://www.oversight.gov/sites/default/files/documents/reports/2025-09/OIG%20Audit%20Report%20No.%2025-AUD-04.pdf.

The transfer of original records from San Bruno to Denver would create a substantial hardship on the statewide allottee community, CILS and CAPDAA and their ability to protect their stakeholder interests, achieve their corporate goals and their representational responsibilities

I, Marty Meeden, declare that I have read the foregoing and know the contents thereof in the above-entitled matter. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true. I declare under penalty of perjury that the foregoing is true and correct.

**10.16.2026**

Date



Marty Meeden

Chair, California Public Domain Allottee Association

Case 3:26-cv-12310 Document 1 Filed 10/21/26 Page 53 of 68 PageID #: 53

Exhibit D

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CALIFORNIA INDIAN LEGAL SERVICES<br>Plaintiff,<br>vs.<br><br>NATIONAL ARCHIVES AND RECORDS ADMINISTRATION and NATIONAL ARCHIVIST BRADFORD WILSON, IN HIS OFFICIAL CAPACITY<br><br>Defendants. | DECLARATION OF MICHAEL GODBE |

I, Michael Godbe, declare:

1. I am Michael Godbe. I am over the age of 18. I have personal knowledge of the facts contained in this declaration, and if called upon to testify I could and would testify competently to the truth of the facts stated herein.
2. I make this Declaration in support of the Plaintiff identified in the above caption.
3. I am currently the Directing Attorney of California Indian Legal Services' Eastern field office, located in Bishop, CA.
4. On or about July 17, 2019, I was assigned a case involving a local tribal member who resided on land that had been his family' Indian allotment. The allotment was not within the boundaries of any Indian reservation.

5. Our client had two concerns: he and his family members were paying county property taxes on the land; and there were a number of non-Indians living on the land without permission or payment to the family.

6. On information and belief, historical researched conducted by CILS before I joined the organization and came on to the case found the land was in fact allotted to our client's great grandfather and had passed on to his grandmother. For unexplained reasons, our client's grandmother began selling portions of the allotment to non-Indians to pay county property taxes.

7. I, and the former CILS attorneys who had worked on the case, had numerous contacts with the Bureau of Indian Affairs ("BIA"), Central California Agency ("CCA") Office regarding our client's land status and were assured in written correspondence and verbally that the land was in trust status. The BIA's (unofficial) Title Status Report further confirmed that the entire allotment remained in trust status.

8. In 2015, CILS successfully resolved the county taxation of our client's land and turned to addressing the individuals who were residing on allotment. Since the BIA's records showed that the land had never passed out of trust status, we understood that none of the land sales to these individuals were approved by the BIA and that the sales were void. In August of 2022, CILS notified the occupiers of the land's trust status and informed them that we believed that the land sales made to them lacked BIA approval and were thus invalid under federal law.

9. In August or September of 2022, CILS received documents from the Inyo Mono Title Company that included a 1948 Order signed by the then Commissioner of Indian Affairs lifting all restrictions on our client's allotment. If valid, this document would have made the subsequent land sales lawful, and revealed an error in the BIA's own records, which still showed the allotment remaining entirely in trust status.

10. Shortly thereafter, in the fall of 2022, CILS shared the 1948 document with the BIA's CCA Office who in turn informed CILS that it would be necessary to search the Pacific

Region's Land Title and Records Office (Sacramento) and National Archives and Records Administration Archives Repository in order to locate the document that was provided by the Title Company.

11. Approximately one year (11 ½ months) later the BIA CCA informed CILS that it had concluded its search, including the Archives in San Bruno and Riverside, California and that the 1948 Commissioner's letter lifting the allotment restrictions could not be located.

12. The delay in the Archives search caused extreme turmoil for not only our clients but also the homeowners, whom we had written to inform that they were living on land we believed to still be an allotment, and that they did not own the land. I was contacted numerous times by homeowners who had received our letter, the title company, and the local press asking for updates which I was unable to provide while the search was still pending.

13. It is anticipated that should the San Bruno BIA documents and files be moved to the Denver Archives, our clients needing critical land documents will delayed even longer than what our client experienced with the BIA CCA Office.

This Declaration is signed in Bishop, California under the penalty of perjury.

DATE: October 19, 2026



Michael Godbe
Directing Attorney
CILS Bishop Office

Exhibit E

CALIFORNIA TRIBAL CHAIRPERSONS ASSOCIATION

**Erica M. Pinto, Chairwoman**
epinto@jiv-nsn.gov

**Jesus Tarango, Vice Chairman**
jtarango@wiltonrancheria-nsn.gov

**Garth Sundberg, Treasurer**
gsundberg@trinidadrancheria.com

**Russell "Buster" Attebery, Secretary**
battebery@karuk.us

**Dale Miller, Member-at-Large**
dmiller@elk-valley.com

**Steven Cope, Member**
stevenc@sanpasqualtribe.org

**Robert Smith, Member**
rsmith@palatribe.com

**Glenda Nelson, Member**
glendan@enterpriserancheria.org

**Octavio Escobedo, Member**
oescobedo@tejonindiantribe-nsn.gov

August 22, 2026

Via email: archivistoftheunitedstates@nara.gov

Edward Forst Acting Archivist
U.S. National Archives and Records Administration
700 Pennsylvania Avenue, N.W.
Washington, D.C. 20408

RE: Proposed Closure of the San Burno/San Francisco Federal Archives

To the Archivist of the United States:

I am reaching out to you as the Chairwoman of the California Tribal Chairpersons Association ("CTCA"). The CTCA is a growing intertribal consortium that coordinates the activities of several tribes in the Northern California area on issues of mutual interest. The area of jurisdiction is bound and defined by the Bureau of Indian Affairs Northern California Agency. The current CTCA Member Tribes are Bear River Band of the Rohnerville Rancheria, Big Lagoon Rancheria, Blue Lake Rancheria, Elk Valley Rancheria, Hoopa Valley Tribe, Karuk Tribe, Pitt River Tribe, Pulikla Tribe of Yurok People, Qua1tz Valley Indian Reservation, Redding Rancheria, Susanville Rancheria, Tolowa Dee-ni' Nation, Trinidad Rancheria, Wiyot Tribe, and Yurok Tribe.

CTCA has recently learned that the National Archive and Records Administration ("NARA") is intending to close and relocate the archival and federal records housed at the San Burno/San Francisco Federal Archives ("Archive") to an undisclosed location. Eleven (11) of the fourteen (14) member Tribes of the CTCA have historical documents held at the Archives. This closure impacts the following CTCA Tribes with archives at that specific location: Big Lagoon Rancheria, Blue Lake Rancheria, Elk Valley Rancheria, Hoopa Valley Tribe, Karuk Tribe, Quartz Valley Indian Reservation, Redding Rancheria, Bear River Band of the Rohnerville Rancheria, Pulikla Tribe of Yurok People, Tolowa Dee-ni' Nation, and Susanville Rancheria. None of our member Tribes have been provided notice from NARA of its decision to the close the Archive nor has NARA consulted with any of our member Tribes on this monumental decision.

The only source of information that CTCA has found on the proposed closure of the Archive is from a July posting from NARA soliciting a "Sources Sought Notice (SSN) For Relocation of Federal Government Records ("SSN")." Based on this SSN we believe the new location for the San Burno Archive documents will be to an out-of-state Archive facility. As the SSN states, the Archive holds approximately 1,730,628 cubic feet of records consisting of federal and archival records. Not included in the SSN is that at least 2,500 cubic feet of these records are Native related documents. We also know that there are volumes of Bureau of Indian Affairs documents also stored at the Archive.

The San Burno Archive is the only accessible source for the thousands of cubic feet of documents that show in detail the history of the relationships between the state of California, the United States, Tribes, and California Native people. This makes these documents critical not only to the Tribes' and the indigenous communities' history but to Tribes ongoing government to government relationship with both the state and federal government. In addition to the inconvenience and delay that Tribes and tribal members will endure doing historical research of archival documents if moved out-of-state; we are deeply concerned that the move can result in valuable documents being damaged or lost. These documents are irreplaceable and once they are gone they are gone forever.

As noted, neither NARA nor any other federal agencies responsible for the closure and relocation of the Archive's records have provided our member Tribes with notice of this decision or consultation with our Tribes. Under NARA's April 26, 2021 "Initial Tribal Consultation Plan of Action ("Consultation Plan")" Section IX. CLOSURE OF FACILITIES OR RECORDS MOVES, it provides:

> "NARA will consult with Tribes whenever NARA considers the closure of a facility that contains records that implicate Tribal interests or whenever NARA intends to permanently move accessioned holdings that implicate Tribal interests from a facility where they have otherwise been available for public research."

NARA's Consultation Plan commits "... to honoring Tribal sovereignty and including Tribal voices in policy deliberation that affects Tribal communities. The federal government, and thus, NARA, has a Tribal trust responsibility, a legally enforceable fiduciary obligation to all federally recognized Tribes. Tribal consultation is a necessary component of upholding the federal government's trust and treaty obligations and serves as a key building block of the Nation to-Nation relationship." (See, Section II, APPROACH TO CONSULTATION)

The California Tribal Chairpersons Association opposes NARA's proposed action to close the San Burno Archive and requests consultation with California Tribes before any further action is taken by NARA on this initiative.

Sincerely

Erica M. Pinto
CTCA Chairwoman

Exhibit F

# NCTCA

## NORTHERN CALIFORNIA TRIBAL CHAIRPERSON'S ASSOCIATION

August 21, 2026

Edward Forst
Acting Archivist
U.S. National Archives and Records Administration
700 Pennsylvania Avenue, N.W. Washington, D.C. 20408
Via email: archivistoftheunitedstates@nara.gov

RE: Proposed Closure of the San Burno/San Francisco Federal Archives

To the Archivist of the United States;

I am reaching out to you as the Chairperson of the Northern California Tribal Chairperson's Association ("NCTCA"). The NCTCA is a growing intertribal consortium that coordinates the activities of several tribes in the Northern California area on issues of mutual interest. The area of jurisdiction is bound and defined by the Bureau of Indian Affairs Northern California Agency. The current NCTCA Member Tribes are: Bear River Band of the Rohnerville Rancheria, Big Lagoon Rancheria, Blue Lake Rancheria, Elk Valley Rancheria, Hoopa Valley Tribe, Karuk Tribe, Pitt River Tribe, Pulikla Tribe of Yurok People, Quartz Valley Indian Reservation, Redding Rancheria, Susanville Rancheria, Tolowa Dee-ni' Nation, Trinidad Rancheria, Wiyot Tribe, and Yurok Tribe.

NCTCA has recently learned that the National Archive and Records Administration ("NARA") is intending to close and relocate the archival and federal records housed at the San Burno/San Francisco Federal Archives ("Archive") to an undisclosed location. Eleven (11) of the fourteen (14) member Tribes of the NCTCA have historical documents held at the Archives. This closure impacts the following NCTCA Tribes with archives at that specific location: Big Lagoon Rancheria, Blue Lake Rancheria, Elk Valley Rancheria, Hoopa Valley Tribe, Karuk Tribe, Quartz Valley Indian Reservation, Redding Rancheria, Bear River Band of the Rohnerville Rancheria, Puliklа Tribe of Yurok People, Tolowa Dee-ni Nation, and Susanville Rancheria. None of our member Tribes have been provided notice from NARA of its decision to the close the Archive nor has NARA consulted with any of our member Tribes on this monumental decision.

The only source of information that NCTCA has found on the proposed closure of the Archive is from a July posting from NARA soliciting a "Sources Sought Notice (SSN) For Relocation of Federal Government Records ("SSN")." Based on this SSN we believe the new location for the San Burno Archive documents will be to an out-of-state Archive facility. As the SSN states, the Archive holds approximately 1,730,628 cubic feet of records consisting of federal and archival records. Not included in the SSN is that at least 2,500 cubic feet of these records are Native related documents. We also know that there are volumes of Bureau of Indian Affairs documents also stored at the Archive.

The San Burno Archive is the only accessible source for the thousands of cubic feet of documents that show in detail the history of the relationships between the state of California, the United States, Tribes, and California Native people. This makes these documents critical not only to the Tribes' and the indigenous communities' history but to Tribes ongoing government to government relationship with both the state and federal government. In addition to the inconvenience and delay that Tribes and tribal members will endure doing historical research of archival documents if moved out-of-state; we are deeply concerned that the move can result in valuable documents being damaged or lost. These documents are irreplaceable and once gone they are gone forever.

As noted, neither NARA nor any other federal agencies responsible for the closure and relocation of the Archive's records have provided our member Tribes with notice of this decision or consulted with our Tribes. Under NARA's April 26, 2021 "Initial Tribal Consultation Plan of Action ("Consultation Plan")" Section IX. CLOSURE OF FACILITIES OR RECORDS MOVES, it provides:

"NARA will consult with Tribes whenever NARA considers the closure of a facility that contains records that implicate Tribal interests or whenever NARA intends to permanently move accessioned holdings that implicate Tribal interests from a facility where they have otherwise been available for public research."

NARA's Consultation Plan commits "... to honoring Tribal sovereignty and including Tribal voices in policy deliberation that affects Tribal communities. The federal government, and thus, NARA, has a Tribal trust responsibility, a legally enforceable fiduciary obligation to all federally recognized Tribes. Tribal consultation is a necessary component of upholding the federal government's trust and treaty obligations and serves as a key building block of the Nation to-Nation relationship." (See, Section II, APPROACH TO CONSULTATION)

The Northern California Tribal Chairperson's Association opposes NARA's proposed action to close the San Burno Archive and requests consultation with California Tribes before any further action is taken by NARA on this initiative.

Sincerely,

Garth Sundberg

Garth Sundberg
NCTCA Chairman

cc: Congressmen Kevin Mullin

Exhibit G

Case 5:26-cv-12310-EJD Document 2 Filed 10/22/26 Page 64 of 68 Page ID #:

# NARA FOIA Request Response

**From:** Operational FOIA and Access Division <foia@nara.gov>
**Sent:** Wednesday, September 9, 2026 5:08 AM
**To:** Dorothy Alther; ogis@nara.gov; ngc.foia.liaisn@nara.gov
**Cc:** Jay Petersen; Alexis George
**Subject:** Re: RE: Freedom of Information Act Request NGC26-645

**Sent via Email <dalther@calindian.org>**

September 9, 2026

Dorothy Alther
609 S Escondido Blvd
Escondido, CA 92025

RE: Freedom of Information Act Request NGC26-645

Dear Ms. Alther :

This is in response to your email requesting a status update for FOIA request **NGC26-645**. Currently, **NGC26-645** is #**569** in our complex FOIA queue. Our estimated time to completion is **56** months from today. This is a conservative estimate, and cases may move more quickly through the queue. If you do not receive a response within this estimated completion time, please contact us again for a status update.

In future correspondence, please cite tracking number **NGC26-645**.

Sincerely,

Operational FOIA Division
National Archives and Records Administration
8601 Adelphi Road
College Park, Maryland, 20740-6001
301-837-3642

On Tue, Sep 8, 2026 at 7:02 PM 'Dorothy Alther' via Operational FOIA and Access Division <FOIA@nara.gov> wrote:

> Your response to my FOIA request was due on August 28th (7 days ago not counting Monday 9/7/2026 holiday) and I have not received any communications from your Office on the status of my request. If I do not receive the documents or hear from you by September 12, 2026 we will proceed with a FOIA action under 5 U.S.C. Section 552(a)(4)(B).

**Dorothy Alther**
*Director of Legal Impact and Legislative Affairs, Principal Office*
**Phone:** (760) 746-8941 x 122
**Direct:** (760) 294-6472
**Email:** dalther@calindian.org

609 S Escondido Blvd
Escondido, CA 92025
**www.calindian.org**

**Subscribe to Our Newsletter | Support Our Mission | Facebook | LinkedIn | Instagram**

***The mission of CILS is to protect and advance Indian rights, Indian self-determination, and tribal nation-building.***

**CONFIDENTIALITY NOTICE: Do not read this e-mail if you are not the intended recipient. This e-mail transmission and any documents, files or previous e-mail messages attached to it may be subject to the attorney-client privilege, be attorney work product, or be strictly confidential. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are now notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is prohibited and unauthorized interception of this e-mail is a violation of federal criminal law. If you have received this e-mail transmission in error, please immediately advise us by reply e-mail to the sender (only), by forwarding the e-mail message to contactCILS@calindian.org or by calling (760) 746-8941, and destroy the original e-mail transmission and its attachments without reading or saving them in any manner. Thank you.**

---

**From:** Operational FOIA and Access Division
**Sent:** Friday, August 14, 2026 2:52 PM
**To:** Dorothy Alther
**Cc:** Operational FOIA and Access Division
**Subject:** Re: RE: Freedom of Information Act Request NGC26-645

**Sent via Email <dalther@calindian.org>**

August 14, 2026

Dorothy Alther 609 S Escondido Blvd Escondido, CA 92025

RE: Freedom of Information Act Request NGC26-645

Dear Ms. Alther,

On **July 17, 2026,** we received your Freedom of Information Act (FOIA) request that was assigned tracking number **NGC26-645** . Your request falls within one of the "unusual circumstances" categories contemplated by the FOIA, 5 U.S.C. §552(a)(6)(B)(iii) (I), (II) and (III), and we need additional time to respond to your request beyond the twenty business days provided by the FOIA statute. Specifically, we need to search for and collect potentially responsive records from an office separate from our office which is processing the request. To enable us to respond more quickly to you, you may wish to reformulate your request to narrow the scope of the request or to arrange an alternative time frame for the processing of this request.

We regret the necessity of this delay but assure you that your request will be processed as soon as possible. In accordance with 5 U.S.C. §552(a)(6)(B)(i) the request will take an additional 10 working days from the date of this letter. Please feel free to contact our office if you have any questions. You may also contact our FOIA Public Liaison for assistance at 8601 Adelphi Road, College Park, MD 20740-6002, 301-837-1750, ngc.foia.liaisn@nara.gov.

You are also free to seek the assistance of the Office of Government Information Services (OGIS), the Federal FOIA

Ombudsman's office that offers mediation services to help resolve disputes between FOIA requesters and Federal agencies. The contact information for OGIS is noted below:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road–OGIS
College Park, MD 20740-6001
Email: oogis@nara.gov Website: ogis.archives.gov
Tel: 202-741-5770 or 1-877-684-6448

Sincerely,

Operational FOIA Division
National Archives and Records Administration
8601 Adelphi Road
College Park, Maryland, 20740-6001
301-837-3642

Exhibit H

**Notice of Tribal Listening Sessions**

Top

NATIONAL ARCHIVES

# Researcher Updates

## 2026

---

## September 2026

### NARA Tribal Listening Session Invitation

Dear Tribal Leader,

Our facilities in Chicago, IL, and San Francisco, CA, will be closing in the next few years. The National Archives and Records Administration (NARA) is interested in engaging with you to better understand the impact of this change as we seek to lessen or mitigate any impact. We also want to build a relationship to receive ongoing inquiries and communications to meet your research needs after the facilities close.

NARA will host virtual meetings on the following dates that will be open to any Tribal Nation with an interest in our Chicago and San Francisco facilities:

October 13, 2026, at 2 p.m. ET

October 15, 2026, at 3 p.m. ET

Please register by sending an email to tribalconsultation@nara.gov with the meeting date(s) your tribal representative(s) will attend and we will provide the virtual meeting connection information. Each meeting will cover the same content so there is no need to attend more than one meeting, but there is no registration restriction.

NARA has also posted updated information about the holdings for our Chicago and San Francisco facilities at https://www.archives.gov/research/news.

You can always email us at tribalconsultation@nara.gov if you have any questions.

We look forward to engaging with you.